**John McINTIRE, et al., Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. C–3–00–213.**

United States District Court,
S.D. Ohio,
Western Division.

March 6, 2001.

Ronald Lee Burdge, Burdge Law Office, Dayton, OH, for Plaintiffs.

Elizabeth A. McNellie, Baker & Hostetler, Columbus, OH, John H. Beisner, Brian Brooks, Benjamin Jacewicz, O'Melveny & Myers LLP, Washington, DC, for Defendant.

## DECISION AND ENTRY SUSTAINING PLAINTIFFS' MOTION FOR REMAND (DOC. # 6); DEFENDANT'S REQUEST FOR ORAL ARGUMENT (DOC. # 10) DENIED; REMAINING PENDING MOTIONS (DOC. # 2, DOC. # 3, DOC. # 4, DOC. # 13, AND DOC. # 17) TO BE ADDRESSED BY STATE COURT; CAPTIONED CAUSE REMANDED TO THE MONTGOMERY COUNTY COURT OF COMMON PLEAS; JUDGMENT TO ENTER ACCORDINGLY; TERMINATION ENTRY.

RICE, Chief Judge.

The instant litigation arises out of alleged intentional misrepresentations by Defendant Ford Motor Company ("Ford") and its Ohio dealers to Ohio consumers, stating that Ford's Lemon Law arbitration process was mandatory and was approved by the Ohio Attorney General and the Federal Trade Commission ("FTC") when, in fact, it was not. Plaintiffs John McIntire, Opal Napier, and Timothy Bissinger (collectively, "Plaintiffs"), as class representatives, each allege that they were informed by Defendant that Ford's Dispute Settlement Board was legally qualified as an informal dispute resolution mechanism under Ohio's Lemon Law and the Magnuson Moss Warranty Act ("MMWA"), and that they could not pursue a judicial action because of such qualification. Plaintiffs seek injunctive relief, prohibiting further misrepresentations and requiring Ford to provide notice of its past violations to class members and to others through signs and newspaper advertisements.

A number of motions are pending before the Court, to wit: 1) Plaintiffs' Motion for Remand (Doc. # 6); 2) Defendant's Motion to Dismiss (Doc. # 2); 3)

Plaintiffs' Motion to Stay (Doc. # 3); 4) Defendant's Motion for a Protective Order (Doc. # 4); 5) Plaintiffs' Motion for Partial Summary Judgment (Doc. # 13); and 6) Defendant's Motion for Summary Judgment for Mootness (Doc. # 17). Because the Court concludes that this litigation must be remanded to state court, the Court will only address Plaintiffs' Motion for Remand (Doc. # 6).[1]

### I. Plaintiffs' Motion for Remand (Doc. # 6)

 The party seeking to litigate in federal court bears the burden of establishing the existence of federal subject matter jurisdiction. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). This is no less true where, as here, it is the defendant, rather than the plaintiff, who seeks the federal forum. *E.g., Ahearn v. Charter Twp. of Bloomfield,* 100 F.3d 451, 453–54 (6th Cir.1996). When the party asserting federal jurisdiction finds its allegations challenged, it must submit evidence substantiating its claims. *Amen v. City of Dearborn,* 532 F.2d 554, 560 (6th Cir.1976). The removing defendant's burden is to prove, by a preponderance of the evidence, that the jurisdictional facts it alleges are true. *Gafford v. General Electric Co.,* 997 F.2d 150, 158 (6th Cir.1993). The district court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat. Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990) (citations omitted). The court may consider such evidence without turning the motion into one for summary judgment. *Id.*

Herein, Defendant has removed this litigation from state court on two bases.

*First,* Ford has alleged that this Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiffs' state law claims are subject to complete preemption. Specifically, it states Congress intended for the MMWA to preempt state law completely and, therefore, Plaintiffs' state law claim, which hinges on the issue of Ford's compliance with FTC regulations, constitutes a federal claim. Although Defendant cites the doctrine of complete preemption, the essence of its assertion is that a consumer may only challenge an informal dispute resolution mechanism, based on non-compliance with the MMWA, in accordance with that statute. It may not be challenged by means of a state law claim (statutory or common law). *Second,* Defendant alleges in its Notice of Removal that subject matter jurisdiction by this Court is proper, because there is diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.

Plaintiffs seek remand of this litigation to state court, arguing that the only question before the Court is whether Defendant violated § 1345.02(B)(10) of the Ohio Consumer Sales Practices Act. Thus, Plaintiffs argue, no federal question is implicated. Plaintiffs further argue that this Court does not have subject matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the amount in controversy is less than the jurisdictional minimum. The Court will first address the parties' arguments regarding federal question subject matter jurisdiction, and then turn to subject matter jurisdiction based on diversity of citizenship.

### A. Federal Question Jurisdiction

 Federal preemption of state law comes in two flavors: conflict preemption

---

1. In addition, Defendant has requested oral argument on Plaintiffs' Motion for Remand (Doc. # 10). Given this Court's conclusion that such would not be helpful to a resolution of the Plaintiffs' Motion, Defendant's request is DENIED.

and complete preemption. Conflict preemption arises where compliance with both federal and state law is physically impossible, or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *see Warner v. Ford Motor Co.*, 46 F.3d 531, 533 (6th Cir.1995)(en banc)(discussing difference between conflict and complete preemption). In contrast, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is [completely] preempted." *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983).

▬ In determining whether a complaint invokes federal subject matter jurisdiction, the court ordinarily begins by examining the plaintiff's well-pleaded complaint. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). The "well-pleaded complaint rule" provides that "the plaintiff is the master of the complaint, that [for removal to be proper] a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court." *Warner*, 46 F.3d at 533. If the plaintiff's claim arises under state law, the mere assertion of federal preemption as a defensive argument will not confer federal question subject matter jurisdiction. As stated by the Supreme Court in *Metropolitan Life Ins. Co. v. Taylor*,

> Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to fed-

eral court. One corollary of the well-pleaded complaint rule developed in the case law, however, is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character.

*Id.* at 63–64, 107 S.Ct. 1542.

▬ To date, however, the Supreme Court has applied the doctrine of complete preemption to only a few federal statutes, most notably section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and section 1132(a) of the Employee Retirement Income and Security Act ("ERISA"). *Strong v. Telectronics Pacing Sys., Inc.*, 78 F.3d 256, 259 (6th Cir.1996); *Smith v. Provident Bank*, 170 F.3d 609 (6th Cir.1999); *see also El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 484, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999) (Price–Anderson Act's unusual preemption provision resembles complete preemption doctrine). The majority of federal circuits to address whether Congress intended to "occupy the field" when it enacted the MMWA have concluded that Congress did not intend to do so. *E.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 899 F.2d 1315 (2d Cir.1990); *Automobile Importers of America, Inc., v. State of Minn.*, 871 F.2d 717 (8th Cir. 1989); *American Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 989–90 (D.C.Cir.1985) ("The legislative history of the Magnuson–Moss Act and predecessor bills indicate that while Congress did not intend the [FTC's] regulations to 'occupy the field,' it did intend FTC rules to have that preemptive effect which flows naturally from a repugnancy between the Commission's valid enactments and state laws."); *Chrysler Corp. v. Texas Motor Vehicle Comm'n*, 755 F.2d 1192 (5th Cir.1985) (Texas Lemon Law not preempted by MMWA); *In re General Motors Corp. Engine Interchange Litiga-*

*tion,* 594 F.2d 1106 (7th Cir.1979) (Congress adopted in substantial part, but did not preempt, state law remedies when it enacted MMWA). In *Abrams, supra,* the Second Circuit rejected the argument that the MMWA completely preempted state law after a thorough review of the statute's language and legislative history. The court reasoned:

> We are not persuaded that Congress intended to occupy the field. Certainly, appellees have not met their burden of showing that the "clear and manifest purpose of Congress," in legislating in this area of traditional state regulation[,] was to preempt state law. Indeed, the purpose of Congress seems to have been just the opposite—that is, that federal law and state law should exist side by side. Thus, the Act directs the FTC to "prescribe rules setting forth minimum requirements for any informal dispute settlement procedure." Use of the term "minimum" strongly suggests that Congress intended federal law in this area to supplement, not supplant, the rights and remedies provided by state law. Otherwise, the term "minimum requirements," rather than "maximum requirements," "exclusive requirements" or some similar phrase would make no sense in this context.

> This reading of the Act is bolstered by other terms of the statute. The Act contains a broad savings clause, which states that "[n]othing in this chapter shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law." Furthermore, the Act does have an express preemption provision, but its effect is narrowly limited to preempting state requirements relating "to labeling or disclosure with respect to written warranties or performance thereunder." Obviously, Congress knew how to preempt in this very statute when it

wanted to. And, the Act allows a warrantor to establish a mechanism that does not conform to the FTC Regulations, so long as the warrantor does not require resort to the mechanism as a prerequisite to filing a lawsuit under the Act. If the Act contemplates non-conforming mechanisms, it is hard to see how Congress can be said to have occupied the field.

> In addition, the legislative history of the Act underlines that it was intended as an alternative, not as an exclusive, approach to informal resolution of warranty disputes. The Senate Conference Report accompanying the Act noted that if a consumer chooses not to use the dispute settlement procedures established under 15 U.S.C. § 2310, then the Act's savings clause "preserves all alternative avenues of redress, and utilization of any informal dispute settlement mechanism would then not be required by any provision of this Act."

> Finally, the FTC itself has interpreted the Act as a supplement to, not a replacement for, state law. Thus, the FTC has stated that the provision that state laws relating to labeling or disclosure are preempted except as provided in the Act's savings clause "makes it absolutely clear that consumer rights and remedies under state law would never be affected by the" Act. The FTC has also asserted that "[i]n general, the protections of the Warranty Act are in addition to, rather than in lieu of, warranty rights and remedies under State law," and that although "allowing the use of uniform warranty documents is a goal of section 111 [15 U.S.C. § 2311], this goal is subordinate to that of permitting the States to fashion their own scheme of warranty rights and remedies which may be more protective than the minimum level of protection of the Fed-

eral Act." In addition, the regulations that the FTC promulgated pursuant to the Act require manufacturers to alert consumers that state law may provide additional rights and protections.

Appellees play down the Act's use of the term "minimum requirements" by arguing that all Congress intended was to leave room for manufacturers to adopt additional requirements voluntarily, not for the states to add requirements. We believe that the Act's other provisions, its legislative history and the FTC's interpretations cited above do not support the view that the term "minimum requirements" gives leeway to manufacturers but not to anyone else.

Appellees also contend that under cases such as *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), *Fidelity Federal Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), Congress can still preempt despite the Act's reference to minimum requirements and despite its savings clause, because the Act and the FTC Regulations set up a carefully articulated regulatory scheme that state law upsets. Appellees fail to recognize, however, that the cases they cite in support of preemption involved instances where there was a clear statement of Congress' intent to preempt state law, or involved the regulation of matters of peculiarly federal concern. Appellees also argue that the comprehensiveness of the FTC Regulations manifests a Congressional intention to preempt the field. However, in a field traditionally regulated by state law, "[w]e are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes."

Finally, appellees point out that the Fourth Circuit has held that Congress intended to occupy the field, citing *Wolf v. Ford Motor Co.*, 829 F.2d 1277, 1279–80 (4th Cir.1987). However, there is conflicting authority, particularly *Automobile Importers of America, Inc. v. Minnesota*, 871 F.2d 717, 721–22 (8th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989); *see also Chrysler Corp.*, 755 F.2d at 1203–04. With all deference, we find the result reached by the Eighth Circuit in *Automobile Importers* more persuasive than that of the Fourth Circuit in *Wolf.* The panel in the latter case did not consider the meaning of the Act's reference to "minimum requirements," which we find significant. Nor did *Wolf* refer to the Act's savings clause, its legislative history or the FTC's interpretations of the Act, upon all of which we have relied.

The Act obviously represents a compromise between warrantors and consumers and, as is frequently the case in such situations, the process of compromise results in a statute creating problems of interpretation. We do not suggest that the Act is crystal clear on the issue of preemption. If it were, presumably this litigation would not be before us. But precisely because the Act is not absolutely clear, the presumption against preempting state regulation in a field traditionally ruled by state law takes on importance. Appellees may be correct that state laws such as the Lemon Law create difficulty for them, and that the lack of uniformity in this area is undesirable. We express no view as to that. However, we believe that this argument is addressed to the wrong forum. It is for Congress and the agency to which it has delegated its power, the FTC, to

make the policy judgment whether national uniformity in the regulation of manufacturers' dispute settlement mechanisms is desirable. By contrast, our task is to determine if Congress has already demonstrated its intention to preempt state law. We hold that Congress did not intend to occupy the field of informal settlement mechanisms for warranty disputes.

*Abrams,* 899 F.2d at 1319–21 (citations and footnote omitted). The Second Circuit's analysis is both thorough and persuasive. This Court, therefore, likewise concludes that the MMWA does not completely preempt the field of informal settlement mechanisms for warranty disputes. Moreover, Defendant's argument that preemption precludes Plaintiffs' state law claim, because to allow such an action would circumvent the MMWA's procedures for bringing a claim under that federal statute, does not sound of complete preemption. Rather, Defendant's argument raises conflict preemption, which does not support removal.[2] Because the doctrine of complete preemption is inapplicable in the present circumstances, the Court cannot conclude that Plaintiffs' state law claim is a "federal claim[ ] dressed in state law costume[ ]." *A.O. Smith Corp. v. American Alternative Ins. Corp.,* 2000 WL 28177, *4 (E.D.La. Jan. 12, 2000). In other words, Plaintiffs' claim for violation of the Ohio Consumer Sales Practices Act, based on misrepresentations of compliance with the MMWA, is not, by its very nature, a federal claim. Accordingly, the doctrine of complete preemption does not provide this Court with subject matter jurisdiction over this litigation.

Although the Court concludes that it does not have federal question subject matter jurisdiction, it may still exercise jurisdiction over this litigation if the requirements set forth in 28 U.S.C. § 1332 are satisfied. Accordingly, the Court now must examine whether it may exercise jurisdiction over this action, based on diversity of citizenship. Specifically, the Court now turns to whether the amount in controversy requirement has been satisfied.

### B. *Amount in Controversy*

28 U.S.C. § 1332(a) sets forth the requirements for subject matter jurisdiction on the basis of diversity of citizenship, one of which is that the amount in controversy exceed $75,000, exclusive of interests and costs. In a diversity case, the appropriateness of subject matter jurisdiction is determined at the time of removal. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 293, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Ahearn,* 100 F.3d at 453. When determining whether the amount in controversy has been satisfied, [the court must] examine the complaint at the time it was filed. *Klepper v. First American Bank,* 916 F.2d 337 (6th Cir.1990)(citing *St. Paul Mercury,* 303 U.S. at 288, 58 S.Ct. 586); *see Horton v. Liberty Mut. Ins. Co.,* 367 U.S. 348, 353, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961). "[T]he amount alleged in the complaint will suffice unless it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount. A plaintiff in a diversity case may defeat removal to federal court by suing for less than the jurisdictional amount. *St. Paul Mercury,* 303 U.S. at 294, 58 S.Ct. 586. Events subsequent to removal which reduce the amount recoverable, including the filing of an amended complaint, do not divest the court of subject matter jurisdiction after it

---

**2.** The Court has not been asked to address whether provisions of the MMWA preempt Plaintiffs' state law claim, under the doctrine of conflict preemption. Because conflict preemption does not provide a basis for removal, such a discussion would be irrelevant.

has attached. *St. Paul Mercury,* 303 U.S. at 292–93, 58 S.Ct. 586.

Where a plaintiff has requested only injunctive relief, such as Plaintiffs herein, the Sixth Circuit has stated that the amount in controversy is the value of the right that the plaintiff seeks to protect or the extent of the injury to be prevented. *Goldsmith v. Sutherland,* 426 F.2d 1395, 1398 (6th Cir.1970); *Lodal, Inc. v. Home Ins. Co. of Ill.,* 1998 WL 393766, *3 (6th Cir. June 12, 1998)("the magistrate judge correctly determined that the value of the right LoDal seeks to protect includes the potential value of future claims under the policy, and that the amount in controversy is therefore $200,000"); *see also Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."). District courts within the Sixth Circuit have recognized that the law is unsettled regarding whose viewpoint— the plaintiff's or the defendant's—should be considered in determining the value of an injunction case. *E.g., Farkas v. Bridgestone/Firestone, Inc.,* 113 F.Supp.2d 1107, 1113 (W.D.Ky.2000); *Sherwood v. Microsoft Corp.,* 91 F.Supp.2d 1196, 1202 (M.D.Tenn.2000). Three general approaches have been taken, to wit: 1) the plaintiffs' perspective, in which the amount in controversy is determined by the amount stated in the complaint or the value of the right plaintiff is asserting; 2) the defendant's viewpoint, which generally considers the defendant's cost of compliance with the requested injunctive relief; and 3) either party's viewpoint. *Sherwood,* 91 F.Supp.2d at 1200–01 (discussing split of opinion about whose viewpoint to use). Consequently, district courts within the Sixth Circuit have reached varying results in their determinations regarding which approach to adopt. *Columbia Gas Transmission Corp. v. Davis,* 33 F.Supp.2d 640 (S.D.Ohio 1998) (Sargus, J.) (adopting plaintiff's view); *Nelson,* 79 F.Supp.2d 813 (rejecting use of defendant's viewpoint); *In Re Cardizem CD Antitrust Litigation,* 90 F.Supp.2d at 834–35 (E.D.Mich.1999)(adopting either viewpoint); *Crosby v. America Online,* 967 F.Supp. 257, 265 (N.D.Ohio 1997)(adopting either viewpoint); *Bedell v. H.R.C. Ltd.,* 522 F.Supp. 732 (E.D.Ky.1981)(using defendant's viewpoint).

The confusion is complicated further when the litigation is a class action. As stated by the court in *Nelson v. Associates Financial Servs. Co. of Ind.,* 79 F.Supp.2d 813 (W.D.Mich.2000):

> There is a growing trend [in non-class action suits] to find the amount in controversy to be met if either the plaintiff's harms or the defendant's cost of compliance will exceed $75,000. The majority of courts, however, have adopted the position that in class actions the plaintiff's viewpoint should be followed. Were the court to consider the amount in controversy from the defendant's viewpoint, the rule against nonaggregation could be circumvented. A defendant should not be able to aggregate its potential cost of complying with injunctive relief sought by multiple plaintiffs in order to obtain a federal forum when the [individual] Plaintiffs cannot do so relative to their claims.

*Id.* at 818 (citations omitted). Not surprisingly, federal circuits are split as to whether a court should consider the defendant's viewpoint in class action cases. For example, the Eleventh and Third Circuits have rejected consideration of the defendant's viewpoint, *Cohen v. Office Depot, Inc.,* 204 F.3d 1069, 1077 (11th Cir.2000); *Packard v. Provident Nat'l Bank,* 994 F.2d 1039 (3d Cir.1993), while the Seventh Circuit has

allowed the defendant's cost of compliance to provide a basis for federal subject matter jurisdiction, *In re Brand Name Prescription Drugs Antitrust Lit.*, 123 F.3d 599, 609–10 (7th Cir.1997) (discussing when the cost of compliance may be considered and aggregated, such that it may form the basis for federal subject matter jurisdiction in class action suits).

Regardless of how the Court might choose to resolve the issue, this Court is not writing on a *tabula rasa*. The Sixth Circuit addressed this issue long ago, in the case of *Pennsylvania R. Co. v. City of Girard*, 210 F.2d 437 (6th Cir.1954). Therein, the City of Girard sued the railroad in state court, seeking damages "for the cost of removal of ashes and debris claimed to have been accumulated upon Byers Avenue, a street in the City of Girard," due to the railroad's alleged negligence. *Id.* at 438. The City further "prayed for a permanent injunction and also for the construction of a retaining wall to prevent the alleged nuisance." *Id.* The railroad removed the action to federal court, a judgment was rendered against it, and it appealed. Before reviewing the merits, the Sixth Circuit *sua sponte* raised the question of subject matter jurisdiction under the diversity statute. Because the sum that the City claimed in damages was insufficient to meet the then-existing $1000 amount-in-controversy requirement, the court commenced to examine the "value" of the requested injunction. The court held that the proper measure of value for the injunction is "the expense to which the plaintiff will reasonably be put through the years [in removing the offending debris] and by the value of the right sought to be protected." *Id.* at 439. In reaching this conclusion as to the proper measure of value, the court relied upon an earlier Sixth Circuit decision, *Wisconsin Electric v. Dumore Co.*, 35 F.2d 555 (6th Cir.1929). In that case, the court valued an injunction seeking to prevent the infringement of a trademark as "the value of the rights the plaintiff seeks to have protected." The plaintiff carried its burden of producing evidence by offering proof "tend[ing] to show value in the [trademark-protected] word as applicable to its business." [3]

The *Pennsylvania R. Co.* decision was subsequently relied upon by the Sixth Circuit in *Goldsmith v. Sutherland*, 426 F.2d 1395 (6th Cir.1970). In *Goldsmith*, the plaintiff, who had been arrested for distributing pamphlets on a military base, sued the Army and sought an injunction. The plaintiff sought to enjoin Army officials from enforcing an order excluding him from the military base. Jurisdiction in federal court was predicated upon the federal question statute, which at that time contained an amount-in-controversy requirement of at least $10,000. In rejecting the plaintiff's claim that an injunction is to be, in some unexplained way, measured by the amount of damages the plaintiff might have received in a suit at law, the court reiterated the rule first expressed in *Wisconsin Electric*, that the value of the legal rights the plaintiff seeks to protect provides the measure of injunctive value. Because the plaintiff in *Goldsmith* could not effectively value his legal rights, the feder-

---

3. In 1929, the party invoking federal subject matter jurisdiction apparently carried only an initial burden of producing evidence in support of jurisdiction. The *Wisconsin Electric* court goes on to discuss that the burden of persuasion fell upon the party objecting to jurisdiction. 35 F.2d at 557 ("plaintiff's proof tended to show value in the word as applicable to its business, and, ... the burden fell upon defendant to establish, by a preponderance of the evidence, that the jurisdictional amount was not involved."). Today, of course, the party seeking to invoke the jurisdiction of the federal courts has the burden of persuading the court that it has subject matter jurisdiction.

al court lacked subject matter jurisdiction over his claims, requiring their dismissal.

The holding in *Goldsmith* has been followed by a number of courts within this Circuit, *e.g., Sherwood, supra; Innovative Digital Equip. v. Quantum Tech.,* 597 F.Supp. 983, 986 (N.D.Ohio 1984); *District 2, Marine Engineers Beneficial Ass'n v. Adams,* 447 F.Supp. 72, 76 (N.D.Ohio 1977), although, as stated above, recent decisions in the district courts have demonstrated a divergence of opinions, *Crosby, supra; Melkus v. Allstate Ins. Co.,* 503 F.Supp. 842, 846 (E.D.Mich.1980). These other district courts, however, have not cited the Sixth Circuit's decisions in *Goldsmith, Pennsylvania R. Co.,* or *Wisconsin Electric.*

▇▇▇ One district court within this Circuit which adopted the defendant's viewpoint in valuing injunctive relief did cite these cases. *Family Motor Inn v. L–K Enterprises Div.,* 369 F.Supp. 766 (E.D.Ky.1973). In that case, the court recognized that the rule in *Goldsmith* applies to original actions; however, it stated that a different rule should apply in the context of a removed case. This Court respectfully disagrees·with that conclusion. It has been stated so often as to become gospel that the same jurisdictional inquiry is applied to originally filed actions as is applied to those removed to federal court. The propriety of removal depends on whether the case originally could have been filed in a federal court. *See, e.g., Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 8, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Accordingly, there can be but one rule for determining the amount in controversy, not different rules, the applicability of which depend upon the procedural posture of the case. Since the Court concludes it is bound by the *Goldsmith* decision, the Court also concludes that it must determine the amount in controversy in this litigation from the perspective of the Plaintiffs.

Turning to Plaintiffs' request for injunctive relief, Plaintiffs' Complaint indicates that they seek to be free of misrepresentations that they must comply with Ford's informal dispute resolution procedures prior to instituting an action in a judicial forum. Neither the Complaint nor Plaintiff's Motion suggests any value for the legal rights that they seek to protect or for the injury to be prevented. Likewise, Defendant, being the party seeking to litigate in the federal forum, has not attempted to demonstrate how to value the requested injunction from the *Plaintiffs'* perspective (as opposed to relying on its cost of compliance), as its burden requires. However, Defendant has indicated in its memorandum that each of the named Plaintiffs has previously litigated his or her warranty claim against Ford to settlement or final judgment (Doc. # 10, n. 3).[4] Thus, it appears that enjoining Ford's alleged wrongful conduct will have little value to these Plaintiffs, and that it would be difficult, at best, to assign a value in monetary terms to their interest in this litigation. There is certainly no basis for this Court to conclude that the value of this litigation exceeds $75,000, either for each named Plaintiff or for all named Plaintiffs when considered in the aggregate. *See Goldsmith,* 426 F.2d at 1398 ("[S]ince we have concluded above that the right to be protected here is incapable of valuation in monetary terms, appellant has failed to carry his burden in proving that the requisite amount in controversy under Section 1331 has been met."). As for the prospective class members who have not yet be-

---

4. Plaintiffs have not disputed this assertion.

gun warranty disputes with Defendant, the right to be free of misrepresentations will have the most value to them, in that they will learn, prior to instituting informal dispute resolution proceedings, that they may proceed directly to litigation on their warranty disputes.[5] However, even for those sub-class members, there is no evidence from which the Court may conclude that the value of this litigation from their perspective exceeds $75,000, whether considered per individual or aggregated as a class. Because neither Plaintiffs in their Complaint nor Defendant in its Opposition Memorandum has provided a basis for determining the value of this litigation *to Plaintiffs*, the Court will not ascribe any value to the requested injunction. Accordingly, considering the amount in controversy from the perspective of the Plaintiffs, the Court cannot conclude that the amount in controversy exceeds the jurisdictional minimum.

▆▆▆▆ Even if this Court were inclined to adopt the defendant's viewpoint approach, something it may not do in light of the *Goldsmith* decision, the Court would still be forced to conclude that the "value" of the injunction is insufficient to vest this Court with jurisdiction. Whether Defendant's cost of compliance results in an amount in controversy greater than $75,000 depends largely on whether Plaintiffs have sought to enforce a common and undivided right, thus allowing aggregation (as opposed to proration) of Ford's cost of compliance among Plaintiffs. The general rule is that the claims of the members of a class in a diversity class action may *not* be aggregated to meet the minimum jurisdictional amount. *Snyder v. Harris*, 394 U.S.

332, 338, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). Aggregation is permissible when "two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." *Id.* "An identifying characteristic of a common and undivided interest is that if one plaintiff cannot or does not collect his share, the shares of the remaining plaintiffs are increased." *Sellers v. O'Connell*, 701 F.2d 575, 579 (6th Cir.1983). Defendant asserts that Plaintiffs' claims may be aggregated, thus allowing it to aggregate the expected costs of providing the requested relief, because the relief, if granted, would only benefit the putative plaintiff class as a whole; "it can afford no greater benefit to any one putative plaintiff class member than to the others." (Doc. # 10 at 7, n. 9)

Federal courts around the country have varied widely regarding what circumstances support the conclusion that the plaintiffs have asserted a common and undivided right, when the relief sought is an injunction. A number of courts have held that the cost of an injunction, as measured by the defendant's costs, must be prorated among all class members. As stated by the Ninth Circuit in *Snow v. Ford Motor Co.*, 561 F.2d 787 (9th Cir.1977):

A finding of jurisdiction in this case would provide Plaintiffs with a means by which to evade the impact of *Snyder* and *Zahn*. If Defendants are allowed to remove such suits to federal court, then Plaintiffs must be allowed to file them in federal court originally. All that Plaintiffs would need to do to avoid the rule of *Snyder* and *Zahn* would be to pray for an injunction.

---

5. The Court questions whether the named Plaintiffs are adequate class representatives for the sub-class of individuals who have not yet begun warranty disputes with Defendant. However, because that issue has not been raised in the instant Motion and the Court concludes herein that it lacks subject matter jurisdiction over this litigation, the issue of the adequacy of the class representatives is more properly left to the state court, to which this action will be remanded.

*Id.* at 791; *see also Crosby,* 967 F.Supp. at 265 ("Since the Plaintiffs could not have aggregated their separate claims in order to reach this court, AOL may not do so upon removing the case. Otherwise, the holding of *Zahn* would be rendered meaningless."). In addition, in addressing requests for injunctive relief that include large-scale advertising campaigns, a number of courts have concluded that such costs may not be aggregated. *Smiley v. Citibank,* 863 F.Supp. 1156, 1164 (C.D.Cal. 1993); *Estrella v. Boots Co.,* 1996 WL 490721, at *2 (N.D.Ill. Aug.26, 1996). As stated in *Smiley:*

> The fact that plaintiff seeks a court-approved public information campaign does not through shear [sic] alchemy transform a cause of action which will provide marginal benefits (in all probability, well less than $100 per class member) into a claim that meets the $50,000 amount in controversy requirement. To hold otherwise would allow any class of plaintiffs who were completely diverse from the defendant to obtain federal jurisdiction merely by seeking an injunction requiring the defendant to engage in an expensive public information campaign announcing the error of his ways.

*Id.* at 1164. Likewise, a number of courts have held that administrative costs associated with compliance with an injunction should not be aggregated in order to reach the amount in controversy. *See In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d at 610 (stating that defendant's clerical or ministerial costs of compliance cannot be used to meet the statutory minimum because "then every case, however trivial, against a large company would cross the threshold").

Other courts have reached the opposite result, based on the conclusion that the requested relief would benefit the class as a whole, rather than any individual plaintiff. *Loizon,* 950 F.Supp. at 253 (finding that plaintiffs' claims presented a "common and undivided right" in corrective advertising because only the class, and not individual class members, could request the injunctive relief); *see also Edge v. Blockbuster Video, Inc.,* 10 F.Supp.2d 1248 (N.D.Ala.1997)(plaintiffs had common and undivided interest in the injunctive relief, because it would deter a course of conduct as a whole and would inure to the "public benefit—the collective good."); *Earnest v. General Motors Corp.,* 923 F.Supp. 1469, 1472–73 (N.D.Ala.1996) (where the court observed that where the equitable relief sought "would benefit the putative class as a whole and not just any individual plaintiff", then "each plaintiff has a common interest in the injunctive and declaratory relief"); *Hoffman v. Vulcan Materials Co.,* 19 F.Supp.2d 475, 483 (M.D.N.C.1998) (where the court considered the defendant's costs of complying with plaintiff's requested injunctive relief and observed that "because the defendant will sustain this loss even if only one plaintiff were to obtain the injunction, this is a case where plaintiffs have an undivided interest in the injunction"); *Cardizem,* 90 F.Supp.2d at 836 ("Plaintiffs seek injunctive relief that will benefit the class as a whole. Defendants' costs of compliance do not depend upon the size of the class or the identity of its members. Accordingly, it is based upon a common and undivided interest and constitutes an integrated claim; its entire value may be considered when determining whether the amount-in-controversy requirement for diversity jurisdiction is satisfied, and that requirement is satisfied here.").

This Court finds the reasoning of the Ninth Circuit in *Snow* to be persuasive. If Plaintiffs had sued for compensatory damages, rather than only injunctive relief, each Plaintiff would have been required to prove the amount of damages that he or

she incurred due to Ford's alleged misrepresentation that he or she was required to submit to Ford's informal dispute resolution process. Such claims would not be common and undivided and, therefore, Plaintiffs would not have been able to aggregate their claims. Thus, to allow them to aggregate their claims when only injunctive relief has been sought, due to the injunctive nature of the relief, would allow Plaintiffs to circumvent the rule of *Snyder* and *Zahn*.[6] Accordingly, even if this Court were free to adopt the defendant's perspective rule (which it is not), Ford would have had the burden of establishing, by the preponderance of the evidence, that the cost of the injunction, prorated among the members of the putative class, either alone or when combined with other aspects of the Plaintiffs' prayer for relief, exceeded $75,000.

The court in *Sherwood, supra,* reached a similar conclusion. In that case, the plaintiffs filed a class action lawsuit in state court, alleging that Microsoft Corporation had engaged in anti-competitive acts by monopolizing the market for Intel-compatible personal computer operating systems, and by tying its internet browser to its computer operating system. Microsoft removed the action to federal court. In responding to the plaintiffs' motion for remand, Microsoft provided evidence that it would cost the company $58.5 million to comply with the plaintiffs' requested injunctive relief, *i.e.,* to design, develop and test a version of Windows 98 that would not provide users with the ability to browse the internet. Accepting this dollar amount as true, the court noted that $58.5 million dollars was the estimated cost to provide relief to the entire class. The court then noted that there would only need to be more than 710 class members to bring the apportionment of that total cost among each class member to less than $75,000 per class member. On that basis, the court concluded that the $58.5 million estimate, when applied to the class, did not satisfy the jurisdictional requirement of § 1332. 91 F.Supp.2d at 1203.

In the present case, Ford has provided evidence that the cost of compliance with Plaintiffs' requested relief would greatly exceed $75,000. According to Mark Loftus, Manager for the Consumer Affairs Dispute Settlement Board ("DSB"), if the Court were to grant the requested injunction, Ford would restructure its dispute resolution procedures to comply with FTC and Ohio Attorney General rules (Loftus Decl. ¶ 7). It would further file applications for certification with the FTC and Ohio Attorney General (*id.* ¶ 8). During the pendency of those applications, Ford would be required to retrain personnel and to engage in protracted negotiations with consumers seeking relief under a warranty (*id.* ¶ 10–11). In addition, Ford would incur significant attorney fees in conjunction with these activities (*id.* ¶ 12). Mr. Loftus represents that the cost of these measures

---

6. Moreover, even if the Court were to accept Defendant's argument that the requested injunction would benefit the class as a whole, the Court is not convinced that the size of the class and the identity of the plaintiffs is irrelevant. Whether Plaintiffs would be entitled to an injunction, requiring advertisements in all cities with populations greater than 25,000 people, would depend on the location of the plaintiffs in Ohio. For example, if all of the class members are located in the Dayton area, it is questionable whether plaintiffs would successfully obtain an injunction, requiring Defendant to place newspaper advertisements in a Cleveland newspaper. Accordingly, it is uncertain whether Defendant's anticipated cost of compliance would be the same, regardless of the number and identity of the class members. Thus, the Court concludes that Defendant has not established that Plaintiffs are enforcing a single title or right, such that Ford's cost of compliance may be aggregated among all class members.

would exceed $75,000. Mr. Loftus further states that Ford would develop new warranty forms and new signage for its dealerships regarding its warranty. He indicates that these costs would collectively exceed $75,000 (*id.* ¶ 15).

Ford has also submitted the declaration of Michelle Cervantez, the Trustmark Marketing Manager for Ford. Ms. Cervantez addresses the costs that Defendant would incur to comply with Plaintiffs' request for notice to class members and other Ford consumers. Specifically, she indicates that it would cost more than $75,000 to place a full-page advertisement in the top three metropolitan newspapers in Ohio (Cervantez Decl. ¶ 5). To place a full-page advertisement in the daily edition of the Cleveland Plain Dealer, the Cincinnati Post/Enquirer, and the Columbus Dispatch would collectively cost $91,009.00 (*id.*). To place a similar advertisement in the Sunday editions of these newspapers would cost $110,497.00 (*id.*). Thus, Ms. Cervantez has provided evidence that Ford's cost of complying with an injunction requiring it to place advertisements, in every newspaper of general circulation in every Ohio city with a population in excess of 25,000 people, would exceed $75,000.

In their Complaint, Plaintiffs allege that they are bringing this action on behalf of themselves and other class members, who are believed to number in excess of 500,-000 persons (Compl.¶ 40). They indicate that these prospective class members fall within two sub-classes, to wit: 1) those who were advised by Ford that they were required to resort to Ford's informal dispute resolution mechanism, but did not do so; and 2) those who were advised by Ford that they were required to resort to Ford's informal dispute resolution mecha-

nism, and did resort to that procedure. Although Defendant has indicated that the cost of advertising, replacing signage, reapplying for certification from the FTC and Ohio Attorney General, and instituting alternative procedures in the interim would cost well in excess of $75,000, the cost of that relief is applicable to the entire class. Taking into consideration the number of prospective class members, Ford's evidence does not indicate that the apportionment of its cost of compliance among each class member would result in a cost of at least $75,000 per class member. Rather, even assuming Defendant's costs approached $1 million, the cost per prospective class member would only be $2.[7] Thus, accepting Defendant's undisputed evidence regarding its cost of compliance with Plaintiffs' requested injunction, that estimate, when applied to the prospective class, does not satisfy the jurisdictional minimum. *See also Smiley v. Citibank,* 863 F.Supp. 1156, 1164 (C.D.Cal.1993). Accordingly, the Court concludes that Defendant has not established that the amount in controversy exceeds $75,000.

For the foregoing reasons, Plaintiff's Motion for Remand (Doc. # 6) is SUSTAINED. Because this action must be remanded to the Montgomery County Court of Common Pleas, the Court will not address Defendant's Motion to Dismiss (Doc. # 2); Plaintiffs' Motion to Stay (Doc. # 3); Defendant's Motion for a Protective Order (Doc. # 4); Plaintiffs' Motion for Partial Summary Judgment (Doc. # 13); and Defendant's Motion for Summary Judgment for Mootness (Doc. # 17).

The captioned cause is remanded to the Montgomery County Court of Common Pleas, from whence it cometh.

Judgment will be entered accordingly.

---

**7.** Although Defendant has not provided the Court with a precise estimate of its anticipated costs of compliance, the Court notes that if Ford's costs were $1 million, a class size of 14 would bring the apportioned cost per class member below $75,000.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.