**BUCKEYE RECYCLERS, Plaintiff,**

v.

**CHEP USA, Defendant.**

**Case No. C–3–01–440.**

United States District Court,
S.D. Ohio,
Western Division.

Aug. 21, 2002.

James A. Wilson, Jr., Vorys, Sater, Seymour & Pease, Columbus, OH, for Plaintiff.

Bridgette Caryn Roman, John Cooper McDonald, Schottenstein, Zox & Dunn, Columbus, OH, for Defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION TO REMAND (DOC. # 7); DEFENDANT DIRECTED TO FILE AMENDED NOTICE OF REMOVAL, WITHIN 20 DAYS OF DATE OF ENTRY, SETTING FORTH CITIZENSHIP OF ITS GENERAL PARTNERS

RICE, Chief Judge.

The parties are now before the Court on Plaintiff Buckeye Recyclers' ("Buckeye") Motion to Remand (Doc. # 7). Defendant CHEP USA ("CHEP") removed this action from the Court of Common Pleas of

Clark County, Ohio, on the basis of diversity jurisdiction, 28 U.S.C. § 1332 (diversity jurisdiction) & 28 U.S.C. § 1441 (removal jurisdiction). (*See* Doc. # 1.) Section 1332 allows a federal district court to hear cases in which the opposing parties are citizens of different states and in which the amount in controversy exceeds $75,000. In its Motion to Remand, Buckeye argues that the amount in controversy does not exceed this statutory minimum.

## I.  *Background Facts*[1]

The underlying facts, as plead in the Plaintiff's Complaint (attached to Doc. # 1), are not in dispute. Buckeye is an Ohio corporation in the business of collecting, repairing, recycling, and/or reselling wooden pallets used for the shipment of goods. CHEP, registered as a general partnership in Florida, rents pallets to any number of commercial entities. Typically, entities with the need for pallets purchase as much from pallet manufactures or pallet recyclers, or rent them from proprietors such as CHEP. Where pallet manufacturers inject pallets into the stream of commerce pursuant to their sale, they generally relinquish title thereto. A pallet's cost, and therefore its title, is generally passed along in the price of the good being shipped as it makes its way through the various trade points in the stream of commerce. On the other hand, some manufacturers require the return of pallets. However, because pallets are manufactured with uniform dimensions and typically have no distinguishing characteristics, such a requirement is typically for the return of pallets in general, not of specific pallets.

Because pallets tend to accumulate in large numbers at distribution and wholesale sites, recyclers such as Buckeye serve a key commercial role by purchasing them in bulk, carrying them away from the distributor's or wholesaler's site, and returning them to the stream of commerce by either reselling them to entities with a need for such or returning them to pallet manufacturers for a fee. In addition to purchasing pallets, Buckeye will also collect broken pallets, repair them, and return them to their owner for a fee. It charges up to $2.50 for pallet repair and return, and up to $5.40 for a pallet's resale. Buckeye does not pre-sort those pallets which it purchases in bulk, but, rather, purchases them sight unseen at the point of collection.

At any given time, about 3% of the total pool of pallets in the stream of commerce in the United States consists of proprietary pallets (i.e., pallets bearing the distinctive mark of their proprietor). CHEP is in the business of renting its proprietary pallets, and in contrast to the bulk of pallets in commerce, each of its pallets is distinctively marked. As part of its rental agreements with its various customers, be they manufacturers, distributors, wholesalers, etc., CHEP requires the return of its specially identified pallets. The exact CHEP pallet need not be returned, so long as a "CHEP" pallet in particular is returned. Failure to return a CHEP pallet may result in the imposition of a lost pallet fee. CHEP polices the flow of its pallets by requiring, pursuant to contract, that all of its customers ship goods on said pallets only to others in the stream of commerce with whom CHEP also has contractual agreements. It is inevitable, though, that a certain number of CHEP pallets get "lost" by CHEP's customers and make their way into the general accumulated mass of pallets collected and resold by recyclers such as Buckeye.

Therein lies the rub of this dispute. Because CHEP asserts that at all times it

---

1.  The undisputed facts set forth herein are taken from Plaintiff's Complaint (attached to Doc. # 1) and the affidavit of Sam McAdow, Sr., Chairman of Buckeye (Doc. # 7 at Ex. A).

retains ownership rights in its distinctively marked pallets, it asserts the correlative right to demand their return by any party which comes into possession of such, and its right to sue the possessing party for conversion to protect such right. Buckeye, which does in fact segregate and safeguard CHEP pallets *after* it makes a bulk purchase, argues that it (as with other recyclers) contributes value and efficiency to the pallet market; that in purchasing pallets in bulk as it does, it becomes the rightful owner of all such pallets; and that, quite the opposite from having a legal obligation to return CHEP pallets to CHEP at its own cost, it has a right either to resell CHEP pallets to others, or to extract a fee from CHEP for its service, as it would with any other manufacturer to whom it returns pallets. Indeed, the typical return fee collected from other proprietary pallet companies is $5 per pallet. Because of legal threats from CHEP, Buckeye alleges that it has lost, and continues to lose, revenue due to lost sales, and has been forced to store excess CHEP pallets at its facility.

Buckeye has asserted five counts in its Complaint. Count One is for a declaratory judgment that CHEP, by insisting that it retains ownership rights in all CHEP pallets, is in violation the Deceptive Trade Practices Act, as codified in Ohio at Chapter 4165 of the Ohio Revised Code. Count Two is for a declaratory judgment that the CHEP pallets which come into Buckeye's possession, through the ordinary course of business, have either been lost or abandoned by CHEP on account of its inability to regulate the flow of such in the stream of commerce, such that it no longer can claim legal title to said pallets. Count Three is for a declaratory judgment that, to the extent CHEP retains an ownership interest in CHEP pallets within Buckeye's possession, Buckeye has a common law lien in such on account of its acts of sorting and safeguarding them, and returning them to the stream of commerce. Count Four is for unspecified money damages and a declaratory judgment that CHEP has been unjustly enriched by Buckeye's acts of sorting and safeguarding its pallets, and returning them to the stream of commerce. Count Five is a claim for tortious interference with Buckeye's business relationships, stemming from CHEP's alleged communications to various entities with whom Buckeye does business, that it (CHEP), as opposed to Buckeye, has the legal right to its distinctively marked pallets. On this final count, Buckeye is seeking damages of approximately $20,000. In addition to money damages and its claims for declaratory judgment, Buckeye is seeking interest, costs, and attorney fees.

In moving for remand, Buckeye contends that it is not seeking an amount in excess of $75,000. In opposing the Motion, CHEP asserts alternative theories for why the Court should deny such action: it argues, *first*, that Buckeye's unspecified money damages may very well exceed $75,000 on their own; *second*, that the Court should consider the cost CHEP would bear if Buckeye prevails on its declaratory judgment claims, which it contends would easily exceed the statutory minimum; and *third*, that even if the Court only considers the economic value of the rights which Buckeye stands to safeguard, should it prevail in this litigation, this aggregate value would also exceed $75,000.

For the reasons set forth herein, the Court finds that CHEP has met its burden of demonstrating that the amount in controversy is likely to exceed $75,000, and that, therefore, the Court may assume subject matter jurisdiction of the case. Buckeye's Motion to Remand (Doc. # 7) is, therefore, OVERRULED.

II. *Analysis*

■ A party can remove an action from state to local court if the federal court to which the action is removed would otherwise have had original jurisdiction. 28 U.S.C. § 1441(a). Generally, where the respective state citizenship of the parties is diverse and the amount in controversy exceeds $75,000, a federal district court has jurisdiction to hear the case. 28 U.S.C. § 1332(a). Herein, as the party removing this action, CHEP has the burden of showing by a preponderance of the evidence that the amount in controversy requirement has been met. *See Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 572 (6th Cir.2001). The analysis must center on the facts as they existed at the time the action was removed. *See id.* at 573. Buckeye is seeking both monetary and declaratory relief. The amount attributable to the requests for declaratory relief is the economic value of the legal rights put into issue by the assertion of these claims. *See Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Goldsmith v. Sutherland*, 426 F.2d 1395, 1398 (6th Cir. 1970). In order to avoid remand, CHEP must be able to demonstrate that it is more likely than not that the aggregate value of Buckeye's claims exceeds $75,000.

*See Gafford v. General Elec. Co.*, 997 F.2d 150, 158 (6th Cir.1993).[2]

Just last year, in *McIntire v. Ford Motor Co.*, 142 F.Supp.2d 911, 920 (S.D.Ohio 2001), this Court discussed the split among the district courts of the Sixth Circuit on the question of whether the amount in controversy attributable to claims for declaratory or injunctive relief should be calculated on the basis of the economic benefit the plaintiff is trying to protect, the economic cost the defendant stands to incur as a result of having to comply with a judgment favorable to the plaintiff, or either, depending on the context. After considering the existing cases and the reasoning underlying the competing theories, as well as Sixth Circuit precedent, most notably the case of *Pennsylvania R. Co. v. City of Girard*, 210 F.2d 437 (6th Cir.1954), subsequently relied upon by the appellate court in *Goldsmith, supra*, this Court held that the better approach is to determine the amount in controversy from the perspective of the plaintiff, with a focus on the economic value of the rights he seeks to protect. 142 F.Supp.2d at 922.

■ In opposing Buckeye's Motion to Remand, CHEP submits, as one argument, that the Court should reconsider the reasoning employed in *McIntire*, and follow the lead of those courts which would view

**2.** CHEP states that remand is not warranted unless it appears to a "legal certainty" that Buckeye's claims are for less than the jurisdictional amount. (Doc. # 10 at 3.) This is the wrong standard. This standard, first announced in *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938), is the proper standard where the amount in controversy appears in the removed complaint to be more than the statutory minimum. Where a plaintiff claims, in state court, damages of an amount which would have entitled her to file originally in a federal court (on the basis of the diversity), the defendant has a statutory right to remove the action, and the plaintiff is not typically allowed to override the defendant's right by subsequently reducing the amount of her claim. If such were the case, removal jurisdiction based on diversity would be hostage to the "plaintiff's caprice." *See St. Paul*, 303 U.S. at 294, 58 S.Ct. 586. On the other hand, the standard is inapplicable in a case such as the one at bar. As explained in *Gafford*, 997 F.2d at 157–60, where a plaintiff files his action in state court for an amount *less* than that which would have allowed him to file originally in federal court, the burden falls on the removing defendant to show that the amount in controversy is in fact great enough to invoke federal diversity jurisdiction.

the amount in controversy as the cost it stands to incur should Buckeye succeed in its suit and it be forced to relinquish its ownership rights in those CHEP pallets which make their way into Buckeye's possession. (Doc. # 10 at 5–7.)

Both of the parties have addressed *McIntire* and the competing theories discussed therein, and the Court is comfortable that it need not repeat herein that with which the parties are obviously familiar. Suffice it to say that so far as the Court can tell, and so far as the parties have indicated, the state of the law has not changed in the Sixth Circuit since this Court issued its decision in *McIntire*. That being the case, the Court is not persuaded by CHEP's argument that it should follow today those decisions which it respectfully declined to follow in *McIntire*.[3] As in that earlier case, and as it believes is required by the holdings in *Pennsylvania R. Co.* and *Goldsmith,* the Court will determine the amount in controversy attributable to Buckeye's claims for declaratory relief by focusing on the economic value of the rights which Buckeye stands to protect should it prevail. If that amount, either by itself or when aggregated with the specified monetary damages sought in its tortious interference claim (approximately $20,000), is more likely than not to exceed $75,000, then remand will not be granted.

At this point, it is important to focus on what *Buckeye* is seeking through its various claims. Buckeye contends that money damages are secondary, and that it is concerned primarily with averting having to defend against a civil suit brought by CHEP, and even criminal prosecution (to the extent it could be charged with theft or receiving stolen property).[4] In many respects, Buckeye's action is akin to a quiet title action. For instance, by seeking, in Count One, a declaratory judgment that CHEP's claims of ownership of those CHEP pallets in Buckeye's possession violate the Deceptive Trade Practices Act, Buckeye is essentially asking a court to declare that CHEP has no right to assert title thereto. The same is even more true of Count Two, through which Buckeye is seeking a declaratory judgment, under the common law of Ohio, that CHEP has either lost or abandoned title thereto. Buckeye does not directly seek to perfect its own title in the pallets, but this is probably not feasible as a practical matter, and it is evident, by negative implication if nothing else, that what it hopes to gain is title free and clear so that it may turn around and return the CHEP pallets to the stream of commerce in its ordinary

3. In any event, CHEP has not adduced any reliable monetary figures on what its cost of complying with a judgment favorable to Buckeye would be. It states in its Notice of Removal, and restates in its Memorandum Contra (Doc. # 10), that it presently has over 1,700,000 pallets circulating in the State of Ohio with an estimated aggregate value of $34,000,000. It further states that if only one quarter of one percent of these pallets were to come into the Buckeye's possession, Buckeye would reap a benefit of $85,000. (Doc. # 10 at 6.) No reliable source has been cited for the accuracy of these figures, and, in any event, the Court is not certain what to make of them other than that CHEP values its pallets at $20 apiece. There is no evidentiary basis for in-ferring that CHEP might suffer a legal detriment of $20 for every pallet not returned by Buckeye (or that Buckeye would realize a benefit of the same amount).

4. Attached as Exhibit A to Buckeye's Reply Memorandum (Doc. # 13) is a copy of what is purported to be a recently returned Cuyahoga County (Ohio) Grand Jury Indictment against an individual, charged with receiving stolen property. Buckeye contends that the indicted individual had received CHEP pallets from his employer's property and attempted to re-sell them on an Internet auction site. The exhibit has no bearing on the outcome of the motion now under consideration.

course of business without fear of civil liability. Of course, however Buckeye desires to characterize its underlying motivation for bringing this suit, the Court's determination of the amount in controversy, attributable to the declaratory judgment claims, turns on an objective evaluation of the economic value of the rights it seeks to protect and/or the potential injury it seeks to prevent.

The practical effect of Buckeye prevailing on either Count One or Two, or both, would be that it could resell CHEP pallets as it does any other pallet. Were it to succeed on either or both of Counts One and Two, Count Three, which states a claim for a declaratory judgment that Buckeye retains a lien on CHEP pallets owing to its efforts to collect, sort, and safeguard them, would drop out of the calculus, as such is plead as an alternative claim to Counts One and Two. Count Four, for unjust enrichment, would also drop out of the calculus. Again, this is an alternative claim to Counts One and Two, as Buckeye could not claim that CHEP receives a benefit from its efforts to preserve pallets in which CHEP no longer has any ownership interest. On the other hand, Count Five, for tortious interference, could exist alongside Counts One and Two. Indeed, given that this claim is premised on CHEP's statements to certain customers it shares in common with Buckeye that only it (CHEP) retains rights in CHEP pallets, Buckeye's chances of prevailing on Count Five correlate directly with its chances of prevailing on Counts One and Two. This is so because the ability to demonstrate that CHEP has no legal right to claim title to those CHEP pallets which have already been injected into the stream of commerce would advance to a significant degree Buckeye's claim that CHEP's statements to their shared customers were not privileged. *See Super Sulky, Inc. v. United States Trotting Ass'n.*, 174 F.3d 733, 741 & 742 (6th Cir.1999) (noting that privileged communications cannot be tortious); Restatement (Second) of Torts § 767 (1979).

Success on Counts One, Two, and Five, the Court believes, would maximize the economic value of Buckeye's cause of action as a whole. Not only would unclouded (or at least unchallenged) ownership maximize the value of its rights as to the disposition of CHEP pallets, but it would also serve as the strongest shield against civil and/or criminal liability. The Court will therefore assess the reasonable economic value of the rights which Buckeye stands to protect should it prevail on these three claims, and determine whether, when taken in the aggregate, it is more likely than not that the amount will exceed $75,000.

Given Buckeye's tortious interference claim, on which it seeks $20,000, the Court can begin its amount in controversy analysis with this base amount. In other words, it actually need only determine whether the economic value of the rights Buckeye stands to protect via Counts One and Two will exceed $55,000.

Buckeye's Chairman, Sam McAdow, Sr., estimates that Buckeye comes into possession of about 800 CHEP pallets per year. Buckeye argues that factoring a maximum gross return of $5.40 on each such pallet, it would realize annual gross revenue of just over $4300. According to the figures provided by Buckeye, this dollar amount would be more or less the same regardless of whether it resold CHEP pallets back to CHEP, or resold them to other third parties. If Buckeye's figures are accurate, this, then, would be the annual economic value it would realize by obtaining a declaratory judgment that CHEP no longer retains title to the CHEP pallets in Buckeye's possession. Furthermore, given that success on Count Five would have the practical effect of preventing CHEP from further interfering with Buckeye's busi-

ness relationships, and assuming CHEP would not abandon the business of renting pallets despite its inability to assert title over those pallets which come into the possession of Buckeye, it can be expected, all else remaining equal, that Buckeye will continue to come into possession of the same number of CHEP pallets on a yearly basis.

CHEP challenges the figures adduced by Buckeye concerning the number of CHEP pallets which come into its possession each year, and the value it realizes from those pallets. Several of Buckeye's answers to CHEP's First Set of Interrogatories, attached as Exhibit A to CHEP's Memorandum Contra (Doc. # 10), are relevant in this regard. In its answer to Interrogatory No. 3, Buckeye stated that while it does not have any contracts with any of its customers to return CHEP pallets, it has, over the past several years, at the request of the Kroger Co. ("Kroger"), transported CHEP pallets from a Kroger distribution center to a CHEP depot. It also regularly transports CHEP pallets from a Kroger distribution center to a Kroger bakery in Columbus, Ohio. For these transportation services, Buckeye collects a fee. Buckeye stated that it will also deliver CHEP pallets which it has in its possession to other customers in need of such pallets on account of said other customers' own contracts with CHEP. This latter service assists CHEP customers in fulfilling their pallet-return obligations to CHEP. For this service, Buckeye collects a storage, handling, and transportation fee.

In its answer to Interrogatory No. 10, it reiterated that about 800 CHEP pallets pass through its own work site on a yearly basis, exclusive of those pallets which it transports from one external location to another (such as those it transports for Kroger). In its answer to Interrogatory No. 11, Buckeye stated that it delivers CHEP pallets to CHEP customers in need of such, as discussed above, in an effort to reduce the number of such pallets it would otherwise be obligated to store at its own facility. Buckeye's apparent obligation to store excess CHEP pallets stems from its fear of reselling them, as it would any other pallet (proprietary or not), on account of CHEP's regular history of threatening it with legal action.

Finally, in its answer to Interrogatory No. 17, Buckeye stated that the business relationships with which it believes CHEP has interfered include that which it has with Kroger, and all of the potential relationships on which it misses out on account of it not being able to resell CHEP pallets without fear of provoking a civil or criminal action against it.

In addition, in response to CHEP's Requests for Production of Documents, in particular Discovery Request No. 1, Buckeye produced photocopies of invoices (and the occasional associated bill of lading) for all CHEP pallets it has transported or handled, covering roughly a two-year period of time, from January of 2000 through January of 2002. (Doc. # 10 at Ex. B.)[5] Buckeye argues in its Reply Memorandum that "none of these documents relate to Buckeye's damages in this case." (Doc. # 13 at 3.) CHEP, for its part, points out that the total value of these invoices is about $337,000, and that all of this "revenue" is material to the question of the

<hr>

5. CHEP did not authenticate these documents, but because Buckeye makes reference, in its Reply Memorandum (Doc. # 13), to all of the documents upon which CHEP relies, the Court is satisfied that these are genuine copies of the documents provided to CHEP by Buckeye. As an additional matter, the Court notes that while the documents themselves have been Bates stamped by Buckeye in a numerical sequence from 00001 to 00147, only 140 document copies have actually been submitted herein by CHEP (by the Courts own count).

amount in controversy. (Doc. # 10 at 8.) CHEP also charges that these documents contradict Buckeye's claims that it only comes into possession of about 800 CHEP pallets a year. Having considered the arguments of both parties, the Court agrees with CHEP.

The Court would agree with CHEP, even if it were only to look at those invoices documenting Buckeye's service of delivering CHEP pallets, which it has segregated and stored at its own facility, to those CHEP customers in need of such by virtue of their own contractual obligations to CHEP to return said pallets. Buckeye argues that the revenue it realizes from this service is immaterial to its action against CHEP. Its lawsuit, Buckeye argues, stems from its desire to be able to resell, without fear of liability, those CHEP pallets which it has hitherto been forced to store at its facility due to CHEP's legal threats, and does not relate to its service of delivering some of its CHEP pallets to CHEP customers. (Doc. # 13 at 3.)

Irrespective of Buckeye's subjective argument, the Court must determine whether this particular service is one which could be jeopardized if a trier of fact found that CHEP retains title to all CHEP pallets, regardless of how they pass into the possession of entities such as Buckeye. As can be gleaned somewhat from CHEP's Counterclaim (Doc. # 2), filed in this Court on the same date as its Notice of Removal (along with its Answer), CHEP believes it is entitled to the delivery and surrender of all CHEP pallets *immediately* upon Buckeye's realization that such have come into its possession. Assuming *arguendo* that CHEP were to prevail on the merits of the ownership issue (as raised in Counts One and Two), the Court believes that it would be within its right to make such a demand upon Buckeye, and that if it did so, Buckeye would be obligated to return the prop-

erty, lest if face an action for conversion. *See Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 24 Ohio App.3d 91, 93, 493 N.E.2d 289, 292 (1985); *Fidelity & Deposit Co. v. Farmers & Citizens Bank*, 72 Ohio App. 432, 434, 52 N.E.2d 549 (Ohio Ct.App. 1943); *Kitchen v. Welsh Ohio, LLC*, 2001 WL 641133 (Ohio App. June 12, 2001). If that were indeed the case, then Buckeye would lose the economic benefit that it currently realizes from its delivery service to CHEP customers. To be sure, as a matter of equity, if nothing else, Buckeye *might* be entitled to some compensation for the economic value it arguably provides to CHEP by sorting, safeguarding, and delivering the CHEP pallets. Indeed, such considerations are at the heart of the alternative claims, Counts Three and Four. Nevertheless, hypothetical equitable factors are not relevant at present. The relevant point at present is that Buckeye would lose its revenue from its regular business relationships. The economic value of this right is what Buckeye stands to protect if it succeeds on Counts One and Two of its Complaint. Thus, on this issue, the Court agrees with CHEP that the revenue Buckeye realizes by delivering CHEP pallets from its own inventory to CHEP customers in need of such should be factored into the amount in controversy calculus.

As acknowledged by Buckeye (Doc. # 13 at 4), the following documents, as attached to Exhibit B of CHEP's Memorandum Contra, and as identified by the Bates number supplied by Buckeye, relate solely to this type of service: 00086–00090; 00092–00094; 00096–00100; 00102–00136; and 00138–00147. As these documents (some of which are merely associated bills of lading) make clear, Buckeye charged CHEP customers a transportation, handling and storage fee, as well as a pallet repair fee when applicable.

Based on the figures which appear in the photocopies submitted by CHEP, when rounded to the nearest whole dollar, the total value of these invoices attributable to the storage, handling, transportation, and/or repair of CHEP pallets, over a two-year period, is about $35,756.[6] This figure by itself is significant.[7]

In *Pennsylvania R.*, where a municipality sought an injunction against a railroad, the Sixth Circuit held, for purposes of determining whether the amount in controversy had been satisfied, that "the value of the controversy ... is measurable by the expense to which the plaintiff will reasonably be put through the years and by the value of the right sought to be protected." 210 F.2d at 439. At the time, the jurisdictional minimum was $3000, but, other than for injunctive relief, the municipality had only petitioned for $1000 in actual money damages. Upholding the district court's finding that the municipality was likely to be irreparably injured were the injunction not to issue, the Sixth Circuit concluded that the amount in controversy had been satisfied, and that the district court had not erred in assuming jurisdiction. *Id.*

*Pennsylvania R.* remains good law to this day. *See McIntire,* 142 F.Supp.2d at 922. For example, where an insurance company sued one of its insureds for the recision of the insured's policy, the Sixth Circuit held that the district court had erred, in dismissing the claim for lack of diversity jurisdiction owing to an insufficient amount in controversy, by not taking into consideration the potential benefits which the insurance company would have to pay if the policy were not rescinded. *Massachusetts Cas. Ins. Co. v. Harmon,* 88 F.3d 415, 416 (6th Cir.1996); *accord Lodal, Inc. v. Home Ins. Co. of Illinois,*

---

**6.** In reaching this total, because the "total" figures on several of the individual invoices were truncated (in the photocopying process) to the right of the decimal point, the Court has simply added the whole dollar amount of each invoice "total," as rounded down. Thus, the Court's total is likely several dollars less than the actual amount of revenue realized by Buckeye on these accounts. In addition, because no "total" appears on document 00088, the Court has disregarded the itemized dollar amounts thereon. This might also deflate Buckeye's true total. In any event, as Buckeye itself has calculated the total of these invoices to be $36,174 (Doc. # 13 at 4), the Court's own figure is more favorable to Buckeye on this issue.

**7.** These invoices also tend to reveal, as CHEP points out, that the actual number of CHEP pallets which pass through Buckeye's possession far exceeds 800 per year. Nevertheless, it is possible to reconcile the statement of McAdow (that Buckeye only comes into possession of about 800 pallets a year) with the drastically higher numbers evidenced by the invoices. This is because, as it characterizes its claim, Buckeye is not seeking relief for any actions related to its service of providing excess CHEP pallets to CHEP customers. In arguing that it expects to realize only about

$4300 per year, if it is successful on Counts One and/or Two, it has limited its theory for relief to what it expects to realize if it is able *to resell* those CHEP pallets which it *cannot otherwise dispose of.* (Doc. # 13 at 3.) There is good reason to think, therefore, that in stating that it comes into possession of and handles only about 800 pallets per year, that it did not intend to include in that figure the number of pallets which it *does* otherwise dispose of, to CHEP customers, as documented by documents 00086–00147. If this is correct, then in calculating the amount in controversy, the $35,756, which Buckeye earned via its service of storing, handling and delivering excess CHEP pallets to CHEP customers, is to be treated as evidence of an additional source of revenue, distinct from that which Buckeye believes it could realize if it could resell the 800 pallets per year it otherwise stores. In any event, even if the invoices and McAdow's statement cannot be reconciled, it is immaterial for the present. As the Court clarifies below, the invoices, when coupled with the damages claimed in the tortious interference claim, is sufficient evidence that the amount in controversy is likely to exceed $75,000.

1998 WL 393766, at **2–3 (6th Cir. June 12, 1998) (finding that where plaintiff's suit was one against its insurer to cover defense costs of a separate lawsuit, district court properly assumed jurisdiction where it was reasonable to think the plaintiff's defense costs in the other suit would eventually exceed the jurisdictional minimum, even though at the time of removal, its accrued costs were not yet half of the jurisdictional minimum). The Supreme Court, too, has endorsed the approach of looking to the plaintiff's future losses for purposes of determining whether the amount in controversy has been satisfied. The plaintiffs in *Hunt, supra*, represented a consortium of apple growers in the State of Washington. Substantively speaking, at issue was a North Carolina regulation, regulating apple shipping containers, which, if enforced, would have imposed an appreciable economic burden on the Washington apple growers. 432 U.S. at 337, 97 S.Ct. 2434. The plaintiffs filed a declaratory judgment action, seeking to overturn the regulation as an unconstitutional infringement on interstate commerce, and also sought an injunction to prevent its enforcement. *Id.* at 339, 97 S.Ct. 2434. The State of North Carolina challenged jurisdiction, arguing that the amount in controversy did not exceed the then minimum amount of $10,000. *Id.* at 346, 97 S.Ct. 2434. The Supreme Court disagreed, and held that because the plaintiffs stood to lose much more than $10,000, in the form of lost earnings and/or compliance costs, were the injunction not granted, they easily met the jurisdictional threshold. *Id.* at 346–48, 97 S.Ct. 2434. The Court stated that it was impossible to say "that such losses and expenses will not, over time, if they have not already, amount to the requisite $10,000." *Id.* at 348, 97 S.Ct. 2434.

It is clear to the Court, then, that in evaluating the figures discussed above, it must consider the likelihood of Buckeye incurring future lost earnings, as well as their reasonable economic value. CHEP contends that even if the Court were to look only at Buckeye's figure of what it expects to lose in annual sales of CHEP pallets, $4300, it would ultimately reach the $75,000 threshold. This may be true, and the Supreme Court's suggestion in *Hunt,* of looking at losses "over time," coupled with the lack of any definitive sentiment in the cases as to how much "time" is "too much time," certainly does not negate this argument. Nevertheless, the revenue Buckeye stands to lose if it is prevented from further engaging in its service of delivering excess CHEP pallets to needy CHEP customers provides a more reasonable expedient for finding that CHEP has satisfied its amount in controversy burden. As noted, the invoices demonstrate that Buckeye earned, over a two-year period, at least $35,756 for this service. Annualized, this amounts to about $17,878 per year. Even without factoring in the $4300 Buckeye might also stand to earn on a yearly basis if it should be allowed to resell CHEP pallets without fear of provoking a civil or criminal action against it, and starting with the base amount of Buckeye's tortious interference claim for $20,000 in damages, CHEP has demonstrated, reasonably, that it is more likely than not that Buckeye will, in only a few years, realize revenue in excess of $55,000. This, the Court believes, constitutes a reasonable and sufficient showing that the amount in controversy component of diversity jurisdiction has been met in this case.

It is worth mentioning that in reaching the conclusion it does, the Court finds it significant that Buckeye has made no argument that it has ceased or intends to cease providing its service of delivering excess CHEP pallets to needy CHEP customers. Indeed, its argument that this lawsuit does not even relate to this partic-

ular service suggests that it does not expect its revenue from this endeavor to cease. The Court will reiterate, though, that the economic value of rights at stake in the declaratory judgment claims (Counts One and Two) is to be viewed from an objective perspective, not Buckeye's subjective perspective. Because, under the law of Ohio for tortious conversion, CHEP would be in the position to demand the return to it of all CHEP pallets within the possession of Buckeye, at any given time, Buckeye's right to provide its delivery service, for which it charges a storage, handling, transportation, and/or repair fee, is clearly at risk, and must be considered in determining the economic value of its claims.

The potential amount in controversy grows only larger when the Court considers the economic value of the transportation service Buckeye provides to Kroger and others. On the face of things, the Court would agree with Buckeye that where it provides a transportation service alone, such as it does in transporting CHEP pallets from one Kroger facility to another, or from the Kroger distribution center to the CHEP depot, the relevancy of the revenue it realizes from the freight charges it collects for this service is not readily apparent. In such a capacity, Buckeye serves merely as a third-party courier of goods. The fact that the goods being carried are CHEP pallets is not significant in itself, as it does not appear that Buckeye asserts any ownership rights therein, or in any other way threatens the rights which CHEP argues it retains. That being the case, even if CHEP does in fact own those pallets, it is not obvious how that fact bears on Buckeye's right to transport them. Nevertheless, Buckeye

stated in its answer to Interrogatory No. 17 that its tortious interference claim stems, in part, from its belief that CHEP has interfered with its relationship with Kroger. It cannot very well claim that CHEP is interfering with its business relationship with Kroger and then turn around and disclaim the materiality of the revenue it receives from that relationship.

If it is true that CHEP has interfered, and continues to interfere, with Buckeye's business relationship with Kroger (see Compl. ¶ 48), then the invoices documenting that relationship are relevant not only to the issue of damages stemming from the alleged tortious interference (Count Five), but also to the issue of the economic value of the rights which Buckeye seeks to protect via its claims concerning ownership (Counts One and Two). After all, the gravamen of Counts One and Two is that CHEP has no lawful right to assert ownership rights in CHEP pallets which come within Buckeye's possession during the ordinary course of its business, and the gravamen of Count Five is that such assertions of ownership rights, to the extent they have been communicated to Kroger and other customers whom CHEP shares in common with Buckeye, have interfered with Buckeye's business relationships. Assuming Buckeye's allegations all prove true, success on Counts One and Two would ostensibly have the effect of alleviating the tortious interference.[8]

The following documents, as attached to Exhibit B of CHEP's Memorandum Contra, and as identified by the Bates number supplied by Buckeye, relate solely to transportation services provided to Kroger: 00001–00005, plus one additional invoice for which the identifying Bates

---

8. With respect only to the tortious interference claim, which is legal in nature, regardless of how valuable the invoices submitted by CHEP may make said claim appear on paper,

it is Buckeye's prerogative to sue for less. *See St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 294, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Gafford,* 997 F.2d at 157.

number (as well as the invoice number) appears to have been cut off in the photocopying process; 00008–00014; 00017; 00019; 00023–00024; 00027–00028; 00031; 00040–00063; and 00065–00081 & 00085, plus one additional invoice for which the identifying Bates number appears to have been cut off in the photocopying process (invoice number 116994). (An invoice identified as 00064 appears irrelevant, as it relates to the sale of non-CHEP pallets.) The sum value of these invoices, which span roughly a two-year period, exceeds $185,000. Of course, at this stage of the litigation, this sum is of limited importance, as the extent to which any future assertions of ownership on the part of CHEP may interfere with Buckeye's business relationship with Kroger is a question to be determined upon facts adduced at a trial on the merits. Nevertheless, what this sum does indicate is that Buckeye's business relationship with Kroger provides a significant source of revenue to Buckeye. It is therefore reasonable to assume that to the extent CHEP's assertions of ownership rights in CHEP pallets will continue to interfere with this relationship, the amount in controversy is likely to exceed $75,000.

In sum, the Court finds that it is more likely than not that the amount in controversy will exceed $75,000. This would be true if the Court were to consider only the prayer for $20,000 on the tortious interference claim, and the reasonable economic value of the rights attributable to Buckeye's right to deliver excess CHEP pallets to CHEP customers in need of such. When the Court considers the additional economic value of Buckeye's right to resell those CHEP pallets which currently remain in storage at its facility, and/or the economic value of its right to transport CHEP pallets from one external location to another, as it does on a regular basis for Kroger, it is even more apparent that CHEP has met its burden on the amount in controversy question.[9] Because CHEP has met its burden, Buckeye's Motion to Remand (Doc. # 7) is OVERRULED.

One additional matter yet remains to be discussed, and that is the sufficiency of CHEP's Notice of Removal. As it has been stated, in this case, the burden of showing that federal subject matter jurisdiction exists is on CHEP. Although the Court is satisfied that the amount in controversy is not an impediment to its jurisdiction, there remains a question of diversity of citizenship itself. As a general partnership, CHEP's state of citizenship is that of each of its partners, not of the partnership itself. *See Carden v. Arkoma Assoc.*, 494 U.S. 185, 189–97, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). To date, there has been no showing that the general partners of CHEP are diverse from Buckeye. That being the case, the Court directs CHEP to file, within 20 days of date, an amended Notice of Removal, reflecting the citizenship of its general partners. If the Court is not satisfied that the parties are diverse, the case will be remanded on that basis. If it is so satisfied, the case shall proceed accordingly.

III. *Conclusion*

For the reasons stated, Buckeye's Motion to Remand (Doc. # 7) is OVERRULED. Furthermore, the Court directs

---

**9.** While it is true that Buckeye also seeks costs and attorneys' fees, no evidence has been adduced by CHEP as to what such an amount would be. In addition, although CHEP argues that the Court should consider the value of the goodwill which Buckeye seeks to protect, even if this is a valid argument, CHEP, again, has adduced no evidence as to what the value might be in Buckeye's case. It merely directs the Court's attention back to the value of the invoices to establish the value of Buckeye's business relationships. To the extent the invoices are relevant, they will be considered as has already been discussed.