*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0109p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PEGGY WELSHANS WILLIAMSON, and VANESSA
WELSHANS,

*Plaintiffs-Appellants,*

No. 05-6911

*v.*

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 04-02851—J. Daniel Breen, District Judge.

Argued: December 7, 2006

Decided and Filed: March 22, 2007

Before: SILER, GILMAN, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Kathleen G. Morris, KATHLEEN G. MORRIS, ATTORNEY AT LAW, Nashville, Tennessee, for Appellants. Herbert E. Gerson, FORD & HARRISON, Memphis, Tennessee, for Appellee. **ON BRIEF:** Kathleen G. Morris, KATHLEEN G. MORRIS, ATTORNEY AT LAW, Nashville, Tennessee, Kent J. Rubens, RIEVES, RUBENS & MAYTON, West Memphis, ARKANSAS, for Appellants. Herbert E. Gerson, Thomas J. Walsh, Jr., P. Daniel Riederer, FORD & HARRISON, Memphis, Tennessee, for Appellee.

---

## OPINION

---

GRIFFIN, Circuit Judge. Plaintiffs Peggy Welshans Williamson and Vanessa Welshans appeal the district court's grant of summary judgment in favor of defendant Aetna Life Insurance Company ("Aetna"). Plaintiffs initially brought suit in Tennessee state court alleging violations of common law breach of contract, violations of the Tennessee Consumer Protection Act ("TCPA"), TENN. CODE ANN. § 47-18-104, and the Tennessee "bad faith" statute, TENN. CODE ANN. § 56-7-105. Specifically, plaintiffs alleged that Aetna wrongfully denied health insurance benefits for Williamson's daughter, Welshans, pursuant to an employee health plan administered by Aetna. In October 2004, Aetna removed the matter to federal district court, and, in November 2005, the district court granted Aetna's summary judgment motion with respect to all of plaintiffs' claims. Plaintiffs

1

now urge this court to reverse both the jurisdictional determination of the district court and its subsequent grant of summary judgment in favor of Aetna.

For the reasons that follow, we affirm.

I.

Williamson was employed by General Agencies of the United Methodist Church ("General Agencies") from 1977 until she retired in 1995. General Agencies provided group health insurance (the "plan") to its employees, and, as part of Williamson's retirement, she continued to be eligible for the plan. Williamson was a member of the task force at General Agencies that designed the employer's insurance plan and recommended that Aetna be selected as the plan administrator. Based on that recommendation, General Agencies contracted with Aetna to administer its group health plan from January 1, 1990, through December 31, 2000.

Welshans is Williamson's daughter. In May 1983, when Welshans was twenty-two years old, she was severely injured in an automobile accident in which she sustained broken legs, a broken pelvis, and a broken back. According to plaintiffs, her left knee was severely injured as a result of the accident, and she has subsequently undergone seven surgeries. Her ability to sit, stand, walk, climb stairs, or do any bending or squatting for a sustained period of time is impaired. Until 1986, when Welshans reached the maximum age for coverage as a dependent child, she was eligible for coverage under Williamson's plan through General Agencies. After 1986, Welshans was provided continued coverage by Cigna, the prior administrator of General Agencies' health plan, as a "fully handicapped dependent" because of the injuries she sustained in the accident. Welshans received coverage as a "handicapped dependent" from 1986 to 1995 pursuant to the terms of the plan with Cigna.

Welshans has not been employed since the accident, but she has been a full-time student since 1994. In 1994, she attended East Arkansas Community College in Wynne, Arkansas. In 1995, she transferred to Lambuth University in Jackson, Tennessee. Following her graduation from Lambuth, she earned a masters degree in American history from the University of Memphis in 2000 and has since enrolled in the doctoral program. At the time of her deposition, she expected to complete a doctorate in American History and Modern Europe in 2004. According to Aetna's brief, she has since completed the doctorate. Welshans is physically and mentally able to care for herself, and she lived independently in Wynne, Arkansas, while attending community college. She occasionally lived with her mother while attending Lambuth University from 1995-1998, and, since 1998, has lived alone in the Memphis and Collierville, Tennessee area. Welshans has received Social Security Disability income since 1984 and has no other source of disposable income. Welshans transfers money from Williamson's bank account into her own account each month as needed to meet her living expenses, including rent, bills, and food.

Welshans and Williamson both participated in the indemnity provisions of General Agencies' group health plan during the time in which Aetna served as the administrator. The indemnity provisions provided that the insured was responsible for the submission of claims to Aetna. The plan further identified procedures and other health care services that were excluded from the plan.

In January 1995, when Aetna began administering the plan, Welshans was thirty-four years of age. Because of her age, Welshans was ineligible for coverage as a dependent child of Williamson. The plan provided, however, that "Health Insurance Coverage for [the insured's] fully handicapped dependent may be continued past the maximum age for a dependent child, if he or she has not been issued a personal medical conversion policy." The plan defined a "fully handicapped dependent" as a person:

not able to earn his or her own living because of mental retardation or physical handicap which started prior to the date he or she reaches the maximum age for dependents; and

he or she chiefly depends on [the insured] or another care provider for support.

"Dependent on another care provider" is defined as requiring a "Community Integrated Living Arrangement, group home supervised apartment or other residential services licensed or certified by the Department of Mental Health and Developmental Disabilities, the Department of Public Health or the Department of Public Aid."

According to the plan, once coverage has been established, it will continue until any one of the following occurrences:  (1) "cessation of the handicap and dependency"; (2) "[t]he end of a 60 day period from the date Aetna requests proof of the continuation of the handicap and dependency, if proof is not provided within a 60 day period"; or (3) "Termination of Dependent Coverage as to [the insured's] dependent for any reason other than reaching the maximum age."  The plan specifically confers upon Aetna the right to "request proof of the continuation of the handicap as often as it may reasonably require, but not before 2 months prior to the dependent reaching the maximum age."

When Aetna took over the administration of the General Agencies health plan in 1995, it initially rejected medical claims submitted by Welshans and other children of insured employees, whom Cigna had previously provided coverage for as handicapped dependents, because of a computer error.  In response to the error, Aetna instituted a policy by which it would "cover all incapacitated dependents [including Welshans] without question" for the calendar year 1995.  Aetna further stated that it expected to return to normal procedures to determine eligibility by January 1, 1996, at which time dependents could be terminated if they did not meet the plan's eligibility criteria.

On July 26, 1996, Aetna first denied Welshans' coverage as a handicapped dependent.  According to Williamson and Aetna's internal notes, Aetna determined that she was "not handicapped as described in the plan because the physical limitations described do not seem to be of a severity to preclude full time employment."  Williamson sent a second request for continuation of coverage in August 1996, along with a statement from Welshans' doctor, Dr. Thomas Limbird, describing her injuries in detail and opining that she was unable to maintain employment.  Aetna requested additional information regarding Welshans' dependent and marital status in a letter dated September 14, 1996.

It is unclear whether further determinations were made as to Welshans' eligibility in 1996, 1997, or 1998.  Some form of litigation between the two parties has been ongoing since 1996.  Welshans originally filed suit against Aetna in federal district court in 1996, alleging diversity jurisdiction and seeking payment of medical benefit claims.  This matter was resolved by settlement in June 1998, and Aetna states that "it is undisputed that Aetna extended coverage to Welshans as a handicapped dependent from 1995-1999."[1]

On October 8, 1999, and November 8, 1999, Aetna again requested verification of Welshans' status as a handicapped dependent.  It is unclear whether plaintiffs responded to these requests.  Aetna claims that plaintiffs did not respond, citing both the deposition testimony of Aetna's employee and internal notes recording the non-receipt of this requested information.  Williamson

---

[1]The parties appear to agree that this prior matter was resolved by settlement, but Aetna proffers that "[a]mong the settlement terms was the requirement that Welshans submit all necessary proof and other documentation required by the health plan to establish her coverage under the plan."

did not produce any documentary evidence or recall a specific date, but generally alleged that she responded to all requests for information.

Although the district court states that "It [was] undisputed that Aetna terminated Welshans' coverage in 1999," the termination date is unclear from the record. It is clear that Aetna denied many of Welshans' claims in 1999. Aetna's internal notes, dated November 16, 1999, state that "no incapacitated child info received[;] will close out the contact." Further, Aetna's list of claims states, for the first time, on February 26, 2000, that a claim was denied because coverage was terminated. Around the same time, however, Aetna mailed Williamson a "Certification of Prior Group Health Coverage," prepared on May 19, 2000, which provided "evidence of prior health coverage" for Welshans from January 1, 1995, to January 2, 2000. Neither the district court opinion nor Aetna addresses this document.

On January 22, 1999, plaintiffs filed separate complaints in district court[2] alleging diversity jurisdiction and stating claims for breach of contract and violations of the Tennessee Consumer Protection Act and the Tennessee "bad faith" statute as a result of Aetna's alleged failure to pay Welshans' medical claims. In September 2003, prior to the conclusion of a bench trial, plaintiffs voluntarily non-suited their case, and the court dismissed the action without prejudice. Subsequently, on September 15, 2004, plaintiffs filed a complaint in Tennessee state court setting damages at less than $75,000. Aetna removed the action to federal district court based on diversity of citizenship in October 2004. Plaintiffs filed a motion to remand, arguing that the amount in controversy did not satisfy federal requirements. The district court rejected this argument, and subsequently granted Aetna's summary judgment motion on the merits of the case, concluding that plaintiffs had failed to set forth any evidence that a breach of contract occurred, or that Aetna acted deceitfully or in bad faith. Plaintiffs timely appealed.

II.

The district court denied plaintiffs' motion to remand and granted Aetna's summary judgment motion; thus, the standard of review is de novo. *Davis v. McCourt*, 226 F.3d 506, 509 (6th Cir. 2002); *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996).

The first question we must address is whether the district court possessed subject matter jurisdiction. Plaintiffs concede that the parties are diverse, but argue that the district court's denial of their motion to remand to state court was in error because the amended complaint alleged damages of less than $75,000, thereby falling short of the amount-in-controversy threshold for diversity jurisdiction. Aetna contends that diversity jurisdiction is established because it is "more likely than not" that plaintiffs' complaint seeks damages in excess of $75,000.

Removal of cases from state to federal court is governed by 28 U.S.C. § 1441(a), which provides that "any civil action brought in state court of which the district courts of the United States have original jurisdiction may be removed by the defendant or the defendants to the district court of the United States . . . where such action is pending." 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states." 28 U.S.C. § 1332(a). A defendant seeking to remove a case to federal court has the burden of proving that the district court possesses jurisdiction. *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 155 (6th Cir. 1993). Jurisdiction is determined at the time of removal, and subsequent events, "whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction

---

[2]Plaintiffs' separate complaints were thereafter consolidated by the state court in March 2000.

once it has attached." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293 (1938); *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 872 (6th Cir. 2000).

On September 15, 2004, plaintiffs filed their second amended complaint[3] in the Circuit Court of Shelby County, Tennessee, which was amended on September 20, 2004. In the second complaint, plaintiffs reassert the previously dismissed claims and request

> judgment three times the amount of their actual damages [$74,999] (including pre-judgment interest), which are to be determined at trial, or alternatively, their actual damages (including pre-judgment interest) plus the 25 percent penalty provided by Tenn. Code Ann. § 56-7-105, but limited to $74,999 exclusive of interest, costs, and attorneys fees.

Plaintiffs aver that this limitation means that Aetna cannot demonstrate that the amount in controversy exceeds $75,000.

The district court held that, although generally plaintiffs "may choose to claim less than the federal requirement in order to preclude removal from state court," Tennessee's rules of civil procedure enabled plaintiffs to claim an amount lower than the jurisdictional amount in the complaint, yet seek to recover damages in excess of that amount (citing TENN. R. CIV. P. 54.03). Tennessee Rule 54.03 provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." TENN. R. CIV. P. 54.03. Thus, the district court concluded, Aetna must demonstrate that it was "more likely than not" that the amount in controversy would exceed $75,000. *See Rogers*, 230 F.3d at 871 (6th Cir. 2000).

To this effect, the district court continued:

> The amount in controversy is determined by the allegations in the complaint. *National Nail Corp. v. Moore*, 139 F. Supp. 2d 848, 850 (W.D. Mich. 2001) (citing *Laughlin v. KMart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995)). In their complaint, Plaintiffs allege that, as a result of Defendants wrongful acts in denying Welshans medical insurance claims during the period of 1995-2000, they have suffered damages in the amount of $74,999. . . . Plaintiffs further aver that they are entitled to recover treble the amount of actual damages pursuant to Tenn. Code Ann. § 47-18-109 and an additional twenty-five percent penalty on all sums recovered under Tenn. Code Ann. § 56-7-105. . . . Calculating the relief requested using the damages suffered, the complaint asserts that Plaintiffs are entitled to recover up to $74,999 under Count I; $223,997 under Count II; and $93,748.75 under Count III.

On appeal, plaintiffs attempt to reargue the same objections they made before the district court; namely, that the stipulation in their Motion to Remand that "they do not and will not seek or request judgment in the amount of $75,000 or greater, exclusive of interest and costs," precludes federal jurisdiction. We need not reach this argument because we hold that the request for attorneys' fees properly placed this case within the purview of federal jurisdiction, and we thereby affirm the district court's exercise of jurisdiction on other grounds. *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 251 (6th Cir. 1994) ("[W]e may affirm on any grounds supported by the record, even though they may be different from the grounds relied on by the district court." (citing *Hilliard v. U.S. Postal Service*, 814 F.2d 325, 326 (6th Cir. 1987)).

---

[3]Plaintiffs' first complaint in federal court sought actual damages "in an amount as yet undetermined but in excess of $75,000." As stated, in September 2003, plaintiffs voluntarily non-suited their case, and the district court dismissed the action without prejudice.

As a general rule, attorneys' fees are excludable in determining the amount in controversy for purposes of diversity, unless the fees are provided for by contract or where a statute mandates or expressly allows the payment of such fees. *Clark v. Nat. Travelers Life Ins. Co.*, 518 F.2d 1167, 1168 (6th Cir. 1975) ("It is settled that the statutory penalty and a statutory attorney's fee can be considered in determining whether the jurisdictional amount is met.").

We have recently applied this principle, albeit in an unpublished opinion.[4] In *Woodmen of the World/Omaha Woodmen Life Ins. Soc'y v. Scarbro*, 129 F. App'x 194, 195-96 (6th Cir. 2005) (unpublished), we examined what constituted "costs" in a plaintiff's claim for declaratory judgment. The plaintiff, Woodmen, appealed a district court's order granting summary judgment to the defendant in an action filed by the insurance company seeking to force Scarbro to arbitrate a dispute under an insurance contract previously entered between the parties. The district court found that the amount in controversy was insufficient to establish subject matter jurisdiction in federal court and entered an order of dismissal. We reversed, stating:

> It is generally agreed in this circuit that the amount in controversy should be determined "from the perspective of the plaintiff, with a focus on the economic value of the rights he seeks to protect." *Buckeye Recyclers v. CHEP USA*, 228 F. Supp. 2d 818, 821 (S.D. Ohio 2002); *see Pennsylvania R. Co. v. City of Girard*, 210 F.2d 437 (6th Cir. 1954); *Goldsmith v. Sutherland*, 426 F.2d 1395, 1398 (6th Cir. 1970); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3708 (3d ed. 1998).

*Woodmen*, 129 F. App'x at 195-96. This amount, we concluded, included not only the face value of the insurance contract, but also compensation awardable by law for mental anguish and for loss of business income, attorneys' fees, and punitive damages. *Id.* In short, "the 'object' of th[e] litigation, cannot be determined without reference to the potential cost of the state claim to the insurance company." *Id.* at 196.

Although the *Woodmen* case is neither factually identical to this case, nor precedentially binding, we have affirmed the general principle of considering statutorily authorized attorneys' fees for purposes of establishing jurisdiction, *Clark*, 518 F.2d at 1168-69, and determine that it is likewise appropriate in this case. *See also Stokes v. Reeves*, 245 F.2d 700 (9th Cir. 1957) (holding that where there is a state statute allowing attorneys' fees, it is applicable in diversity cases, and the amount claimed thereunder may be taken into account in determining whether the jurisdictional amount is involved); *Johnson v. America Online, Inc.*, 280 F. Supp. 2d 1018 (N.D. Cal. 2003) (holding that, typically, attorneys' fees are not considered part of amount in controversy for diversity purposes; however, where underlying statute authorizes award of attorney fees, those fees may be included in calculating amount in controversy); *In re High Fructose Corn Syrup Antitrust Litig.*, 936 F. Supp. 530 (C.D. Ill. 1996) (holding that attorneys' fees can be considered in determining whether plaintiff has satisfied amount-in-controversy requirement for diversity jurisdiction, where statute mandates or allows payment of such fees, although as general rule attorneys' fees are excluded in determining amount in controversy); *Hendrickson v. Xerox Corp.*, 751 F. Supp. 175 (D. Or. 1990) (holding that for purposes of determining if amount in controversy satisfies jurisdictional requirements, attorneys' fees may be taken into account if statute authorizes awarding fees to successful litigant); *Hall v. Travelers Ins. Co.*, 691 F. Supp. 1406 (N.D. Ga. 1988) (holding that where attorneys' fees are allowable by applicable law, they may be included in assessing jurisdictional amount in controversy for purposes of diversity jurisdiction).

---

[4]Unpublished opinions of this court are not precedentially binding under the doctrine of stare decisis. *United States v. Sanford*, Nos. 05-6489/6500, – F.3d – , 2007 WL 325742, at *4 (6th Cir. Feb. 6, 2007).

Here, two of the statutes upon which Williamson relies clearly allow the awarding of attorneys' fees. *See* TENN. CODE ANN. §§ 47-18-109(e)(1), 56-7-105. Further, as the district court recounted, the plaintiffs second complaint requested:

> judgment three times the amount of their actual damages [$74,999] (including pre-judgment interest), which are to be determined at trial, or alternatively, their actual damages (including pre-judgment interest) plus the 25 percent penalty provided by Tenn. Code Ann. § 56-7-105, but limited to $74,999 exclusive of interest, costs, and attorneys fees.

Accordingly, we hold "it was more likely than not" that the "potential cost of the state claim to the insurance company," *Woodmen*, 129 F. App'x at 196, would exceed $75,000, and, thus, the district court correctly concluded that it possessed subject matter jurisdiction based on diversity of citizenship.

### III.

Next, plaintiffs contend that the district court erred in holding that there were no genuine issues of material fact with respect to their asserted claims and, accordingly, urge this court to reverse. The thrust of plaintiffs' argument, however, remains the same. Instead of addressing the grounds on which the district court held that Aetna permissibly terminated Welshans' coverage – that she did not reply to Aetna's request for more information – plaintiffs argue that Aetna had all of the information it needed on file and, accordingly, was wrong in denying Welshans' claims. We disagree.

### A.        *Tennessee Consumers' Protection Act.*

The district court correctly noted that to establish a claim pursuant to the Tennessee Consumers' Protection Act ("TCPA"), a plaintiff must prove "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . . .'" (citing *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115-16 (Tenn. Ct. App.), *app. denied* (Tenn. 2005) (quoting TENN. CODE ANN. § 47-18-109(a)(1))). In a well-reasoned discussion, the district court examined plaintiffs' arguments and concluded that they had not alleged these elements with any specificity, excepting Welshans' eligibility as a handicapped dependent. With respect to this allegation, the district court concluded that, at worst, these denials amounted to an "erroneous denial" of a claim and, accordingly, did not constitute an act of deception or unfairness (citing *Hamer v. Harris*, 2002 WL 31469213, *1 (Tenn. Ct. App. Nov. 6, 2002)). We see no reason to disturb this holding or analysis.

### B.        *Bad Faith Claims.*

Plaintiffs further contend that the district court erred in concluding that they had submitted insufficient evidence to substantiate their claims of bad faith. Plaintiffs allege that Aetna "knowingly disregarded the evidence in its file and the language of the Plan" that Welshans was a handicapped dependent and, further, "took affirmative steps to secretly alter the Plan terms for handicapped dependent without ever actually modifying the Plan or advising Appellants and other insureds."

The district court correctly set forth the elements of a bad faith claim pursuant to Tennessee law. *See* TENN. CODE ANN. § 56-7-105. In the context of a claim for bad-faith denial of insurance coverage, a plaintiff must demonstrate: "(1) that the insurance policy, by its terms, became due and payable; (2) that a formal demand for payment was made; (3) that Plaintiffs waited sixty days after making demand before filing suit; and (4) that Aetna's refusal to pay was not in good faith." (citing

*Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986).  Plaintiffs, the insured, bear the burden of proving bad faith on the part of Aetna in denying payment.  *See id.*  "A penalty is not appropriate when the insurer's refusal to pay rests on legitimate and substantial legal grounds."  *Tyber v. Great Central Ins. Co.*, 572 F.2d 562, 564 (6th Cir. 1978).

As Aetna notes, plaintiffs' attempt to shift the burden of proof, thereby requiring Aetna to prove that it acted in good faith, is without merit.  Plaintiffs have simply not put forth any evidence which disproves Aetna's proffered reasons for denying Welshans' claims.  In short, plaintiffs ask us to hold that Aetna's failure to accept the ten-year old, previously-submitted letter from her doctor rendered their denial of Welshans' claims erroneous and in bad faith.  The record reflects, and the district court concluded, that all of Aetna's refusals to pay claims were based upon legitimate grounds for disputing the claims consistent with the terms of the plan.  Plaintiffs have not put forth evidence to demonstrate otherwise.  Plaintiffs' allegation that Aetna  "took affirmative steps to secretly alter the Plan terms for handicapped dependent without ever actually modifying the Plan or advising Appellants and other insureds" is unsupported by the record. The document that plaintiffs direct us to is a summary of the plan benefits, not the language of the contract.  The very next exhibit, presumably a portion of the same document, contains a disclaimer characterizing the document as a summary and cautions, "[i]f there is a difference between the information in this summary and the Plan documents, the Plan documents and contracts will govern."  Thus, plaintiffs' unsupported allegation is without merit.

C.       *Breach of Contract.*

Finally, plaintiffs contend that the district court erred in its ruling that there was insufficient evidence to demonstrate that Aetna breached the contract.  Under Tennessee law, an insurance policy is to be "given its plain and ordinary meaning." *Sec. Ins. Co. of Hartford v. Kevin Tucker & Assoc., Inc*., 64 F.3d 1001, 1006 (6th Cir. 1995).  The court must read the policy according to its lay terms.  *Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 136 F. Supp. 2d 901, 905 (W.D. Tenn. 2001). "Where there is an ambiguity or uncertainty with regards to the terms of an insurance policy, the court must interpret the terms strictly against the drafter of the policy." *NSA DBA Benefit Plan, Inc. v. Conn. Gen. Life Ins. Co.*, 968 S.W.2d 791, 795 (Tenn. Ct. App. 1997).

One of the problems in ascertaining the key dates in the life and termination of this contract is that Aetna paid some claims while simultaneously denying other claims.  The district court divided the claims into two groups:  (1) claims submitted between 1995 and 1998, some of which were paid, and some of which were denied for reasons – Aetna proffers – at least facially consistent with the plan; and (2) claims following Aetna's request, and plaintiffs' apparent failure to provide, for continued documentation of Welshans' handicapped dependent status.

With respect to claims submitted from 1995 to 1998, the district court held that plaintiffs had not submitted sufficient evidence for it to determine that a breach of contract took place, stating:

> [F]rom the information provided by Plaintiffs, the Court is unable to make any determination regarding the validity of Aetna's actions under the contract. Plaintiffs' list of claims provides only the date, provider name, amount claimed and response by Aetna.  Because the Plaintiffs have not provided any information or argument to the Court regarding the basis for the claim and how Aetna's action departed from the terms of the Plan, the Court is unable to make any determination as to whether the claim for the service or product was wrongfully processed. Where Plaintiffs have not supplied an argument for breach of contract on any of the more than 180 claims listed, the Court will not endeavor to do it for them. See *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n.7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a

party's opposition to summary judgment. . . . Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact.").

This conclusion is correct. Although Aetna decidedly paid some of Welshans' claims and denied others, plaintiffs put forth no evidence as to why the denial of the contested claims was inconsistent with the contract. Unfortunately, plaintiffs have proffered the same unsupported arguments on appeal.

Regarding the claims submitted after December 9, 1999, the district court held that Aetna could permissibly deny the claims. Specifically, it held:

As noted above, the Plan provided Aetna with the authority to request proof of Welshans' continued handicap and dependency as it may "reasonably require" to make determinations regarding her eligibility for coverage. . . . As the Court has already determined that Aetna's requests for such information in 1999 were reasonable in light of the circumstances, the only remaining issue is whether Aetna was within its contractual rights to terminate Welshan's [sic] coverage in 1999. The contract provides Aetna with authority to terminate at "[t]he end of a 60 day period from the date Aetna requests proof of the continuation of the handicap and dependency, if proof is not provided within the 60 day period." The uncontroverted evidence demonstrates that Aetna requested such proof on October 8, 1999. Defendant avers that Plaintiffs failed to respond to the request. Plaintiffs have not directed the Court to any evidence to demonstrate that this fact is in dispute. Accordingly, pursuant to the terms of the contract, Aetna could rightfully terminate Welshans' coverage on December 9, 1999.

We agree with the district court's analysis and adopt it as our own.

IV.

For the foregoing reasons, we affirm.